FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ DEC 0 6 2010 ★

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| **MARGO RAMLAL-NANKOE** | **TRAGER, J.** |
| **Plaintiff,** | **J. ORENSTEIN, M.J.** |
| **Against** | **CV ⁻ 0 - 5635** |
| **ITHACA COLLEGE** | **COMPLAINT** |
| **Defendant,** | **JURY TRIAL DEMANDED** |

---

## INTRODUCTORY STATEMENT

This is a civil rights action in which the plaintiff, MARGO RAMLAL NANKOE ("NANKOE"), seeks relief from defendant ITHACA COLLEGE'S denial of her right to be free from discrimination based on her sex , race, color and religion in employment and to be accorded all terms, conditions, privileges and benefits of employment accorded to all faculty members at Ithaca College, as guaranteed by Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., the New York State Executive Law '290 et seq., the Tompkins County Fair Practice Statute, Tompkins County Local Law No. 6 of 1991, **and the**

**common law of the State of New York.** The plaintiff seeks, damages, both compensatory and punitive, affirmative and equitable relief, an award of costs and attorneys fees, and such other and further relief as this court deems equitable and just.

## JURISDICTION

1. Jurisdiction is conferred upon this Court by 42 U.S.C. Sec, 2000e-5 (f)(3), this being an action seeking redress for the violation of the plaintiffs federal constitutional, civil and statutory rights.

2. Plaintiffs claim for declaratory and injunctive relief is authorized by 28 U.S.C. Secs. 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

3. The plaintiff further invokes this Court's pendent jurisdiction, pursuant to 28 U.S.C. Sec. 1367(a), over any and all state and county law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

4. The plaintiff demands a trial by jury on each and every one of her claims as pled herein.

## VENUE

**5.** Venue is properly laid in this District under 28 U.S.C. Sec. 1391 (e), this being the District where the plaintiff resides.

## EXHAUSTION

**6.** The plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on **February 10, 2009.** On September 9, 2010 the EEOC issued a Notice of Right to Sue to the plaintiff, which was received by the plaintiff on or about October 1, 2010.

**7.** This complaint is being filed within ninety days of the receipt of the "notice of right to sue" letter by the plaintiff. In all respects, the plaintiff has complied with all procedural requirements to her filing a lawsuit.

**8.** The plaintiff MARGO RAMLAL-NANKOE is a resident of the City of New York, County of Queens, State of New York, 11385.

**9.** Defendant ITHACA COLLEGE is, on information and belief, a New York not-for-profit corporation with its principal place of business at 350 Job Hall, Ithaca, New York, 14850.

## STATEMENT OF FACTS

**10.** The plaintiff is a permanent resident of the United States. The plaintiff's date of birth is November 14, 1953.

-3-

11.     The plaintiff, Dr. Margo Ramlal-Nankoe, is a highly regarded professor who has established a long and distinguished record of teaching, scholarship, and service. Dr. Ramlal-Nankoe was hired for a full-time faculty position in 1997 which was changed in 2000 into a tenure-track assistant professor position in the Department of Sociology at Ithaca College. Dr. Ramlal-Nankoe taught at Ithaca College for twelve years, beginning in February 1997 until May 2009. The 2000 tenure-track appointment letter set the year 2005 as the year she would be considered for tenure.[1] See Exhibit 1. LETTER of APPOINTMENT May 22, 2000.

12.     Prior to her hiring by Ithaca College, Dr. Ramlal-Nankoe had demonstrated her expertise as a successful student, teacher and scholar in Sociology. Dr. Ramlal-Nankoe received her M.A. and Ph.D. from the Department of Sociology at Binghamton University. While at Binghamton University she received a doctoral scholarship award, and was a research associate at the world renown Fernand Braudel Center for the Study of Economies, Historical Systems & Civilizations. She participated in prestigiously awarded research working groups in interdisciplinary large scale and long-term research with leaders in global sociology. Prior to earning her Ph.D. degree she was an Adjunct-Lecturer reputed for her teaching in the Department of Sociology, the Women's Studies Department, and the Latin American and Caribbean Center at Binghamton Uni-

---

[1] See Exhibit 1. LETTER of APPOINTMENT May 22, 2000

versity, where she taught undergraduate courses in global sociology, race, class, and gender, development, and social stratification.

13.     In the first three years prior to her submission of her application for tenure and promotion, Dr. Ramlal-Nankoe had taught 14 different courses. Several of those courses - Transnational experiences of Women (Honors Capstone co-taught), Global Transitions, Multiculturalism Globally, Women in the Third World, Women and Globalization (Capstone co-taught), Girls in the Third World (Capstone co-taught), Girls in War (Capstone co-taught) -were new courses which required a great deal of preparation. Despite carrying a greater than normal teaching load in the three years prior to her tenure year, Dr. Ramlal-Nankoe never received any comment that her teaching did not meet the teaching standards towards tenure from anyone directly knowledgeable with her teaching under the terms of her department's personnel guidelines established for evaluation and review of untenured faculty.

14.     At the time of her tenure review in 2005-2006, the Department of Sociology Tenure Review Committee ("Sociology Committee") stated that Dr. Ramlal-Nankoe met or exceeded the standards for teaching, scholarship and service. The Sociology Department's Policies and Procedures on Tenure Review and Promotion to Associate Professor (rev. 1993) ("Departmental Criteria"), require "teaching excellence." According to the Departmental Criteria, evidence of this standard is shown by classroom performance, course development and modification, written letters of recommendation, supervision of indi-

-5-

vidualized studies, student conferences, direction of honors theses, and ad-
visement. Asessments of excellence in teaching are determined by peers and
students.

15.     On September 1, 2005, Dr. Ramlal-Nankoe submitted her ten-
ure application to the Chairman of the Sociology Committee.

16.     The tenure process at Ithaca College is a multi-faceted proc-
ess which requires the applicant to demonstrate excellence in scholarship,
teaching ability and service to the community. With respect to the area of teach-
ing ability, applicants for tenure submit peer evaluations, course syllabi, teach-
ing materials, exams and other demonstrations of teaching excellence.

17.     The criteria utilized in the consideration for tenure was set out
in the appointment letters received by the plaintiff, as well as in the annual one-
year reappointment contracts that the plaintiff and the defendant signed, in the
Ithaca College Faculty Handbook, and in the Department Criteria, as well as the
2006 guarantees between the administration and the plaintiff, all of which the
plaintiff specifically relied on in preparing her application for promotion and ten-
ure.

18.     The plaintiff's first appointment letter, was dated February
1997. The second appointment letter which was issued on May 22, 2000 and
signed by Dean Howard Erlich of the School of Humanities and Sciences, set

out the terms of Ramlal-Nankoe's contractual relationship with Ithaca College. It set out the effective date of the appointment, and indicate that the plaintiff would be evaluated for tenure during the Fall term of 2005.

19.    The plaintiff's appointment letter of 2000 also indicates that, "Consideration for tenure will require you to demonstrate teaching excellence, appropriate scholarly and professional activity beyond the terminal degree, and constructive service to the college community. In addition, a positive tenure recommendation by the department and the dean will have to demonstrate a long-term enrollment demand in the department." [2] See Exhibit 1. LETTER of APPOINTMENT May 22, 2000.

20.    Prior to each academic year, the plaintiff signed one-year re-appointment contracts. This form was also signed by the Dean, the Provost and the President of the College. This form provided as follows: "This appointment is made in accordance with, and is governed by, the Ithaca College Faculty Handbook, the Governance Document, as well as other policies and procedures approved by the Board of Trustees of Ithaca College."

21.    Section 4.13.1.1 of the Ithaca College Faculty Handbook, explicitly made a part of the plaintiff's terms and conditions of employment as set forth in the contract she signed, sets forth the following criteria for promotion

---

[2] See Exhibit 1, LETTER of APPOINTMENT May 22, 2000

and tenure: ". . . teaching excellence ... a record of scholarly/professional at-
tainment. .." and " . . . service to the institution." Section 4 of the Handbook fur-
ther provided that each unit of the college shall develop appropriate and de-
tailed personnel policies, standards, and procedures for the consideration of
faculty for tenure and promotion. According to the Faculty Handbook the De-
partment Criteria prevail over those of the College where they exist.

22.    At the time of her consideration for promotion and tenure, the
Department of Sociology had in place its own personnel guidelines which spe-
cifically applied to the promotion and tenure process, which were approved by
the Dean of the school as well as the President and Provost of the College.
Section VIII of these guidelines set forth "Criteria for Tenure and/or Promotion to
Associate Professor." Sub-section 2 of Section VIII specifically provides that
teaching effectiveness, one of the three criteria for tenure and promotion, "will
be judged" based on the consideration of a multitude of criteria, not just student
evaluations. This included the consideration of information from the following
categories for which the plaintiff provided information:

A. Individual self-generated data, description and analysts. These data may
   be in the form of an expanded vita in which the candidate will elaborate
   on and describe teaching approach, styles, courses, course load, grad-
   ing, course content, course innovations, changes, additions, curriculum
   development, and any other information descriptive of the candidate's

-8-

role as teacher. Data may include but not be limited to: self-administered and designed questionnaires; letters from students, alumni, employers of former students; prima facie evidence such as results of pre-tests, post-tests, course syllabi, and examples of student output in courses such as projects, papers, and exams.

B. Peer evaluation.

1) Peer evaluations for all faculty members are encouraged. Candidates are encouraged to collect these evaluations over a period of three or more years. It is the candidate's responsibility to initiate the evaluation process.

2) A faculty member's choice of peer evaluator is not limited to the department in which he/she serves.

3) Peer evaluation may include:

a) classroom visitation

b) analysis of course preparation and organization

c) analysis of syllabi and course materials in relationship to class-room visitation

d) analysis of evidence of student learning

e) analysis of other teaching/academic activities

**−9−**

C. Student evaluations. Each semester, students evaluate the courses taught by the faculty. Each faculty member will appoint a student to distribute, collect and submit all student evaluation forms to the Sociology department staff member. The staff member will then process the evaluations and returns these to the faculty after grades are submitted.

23.     Other sections of the Ithaca College Faculty Handbook set forth principles that formed the basis for the plaintiff's contractual relationship with the College. For example, the Ithaca College Faculty Handbook provided that the College and its faculty support the concept of academic freedom as outlined in the statement of principles set out by the American Association of University Professors and the Association of American Colleges. One of the principles set out in that statement is that teachers are entitled to freedom in the classroom to discuss controversial matter so long as that matter has some relationship to the subject matter being taught.

24.     The Faculty Handbook set forth anti-discrimination policies. This section states it is the policy of the College that, in accordance with federal, state and local laws, discrimination on the grounds of sex, race, age, foreign national status, and sexual orientation, as well as sexual harassment will not exist at the College. The College states that it has a zero tolerance policy toward discrimination.

25.    Dr. Ramlal-Nankoe submitted nine peer reviews as part of her tenure package. Nine peer reviews, conducted in a number of different classes by tenured Sociology faculty members as well as peers from other departments at Ithaca College.

26.    As part of the tenure application process, Dr. Ramlal-Nankoe submitted outside review letters from four colleagues. Twelve reviews were extremely positive and each included a strong endorsement for her tenure. Several reviewers also specifically mentioned that Dr. Ramlal-Nankoe's research profile was particularly strong in light of what they considered a heavy teaching load. Only one of the thirteen peer reviews submitted on behalf of Dr. Ramlal-Nankoe was negative. Dr. Ramlal-Nankoe also received numerous letters from former students that all spoke to her teaching excellence in the classroom, and the life-changing experience her teaching has had on them.

27.    On September 2005, a majority of the Sociology Committee determined that Dr. Ramlal-Nankoe had met the standards in all three areas of performance - teaching, scholarship, and service. The Sociology Committee issued a report recommending tenure by a vote of 4 - 3. A minority in the department opposed Dr. Ramlal-Nankoe's tenure.

28.    Because of the Sociology Committee's inability to reach an agreement upon statements concerning Dr. Ramlal-Nankoe's teaching, scholarship and service, a combined majority and minority report was included in the

Sociology Committee's report. The majority of the committee, found that Dr. Ramlal-Nankoe had met the criteria for teaching, scholarship, and service and recommended her for tenure and promotion to associate professor. This evidence of her instructional effectiveness was derived from a variety of data sources: the candidate's statement of pedagogical philosophy, course syllabi and instructional materials, student evaluations, student letters, peer evaluations, curriculum development, professional development, letters of service to the campus and Ithaca community, and other indicators of instructional improvement initiatives and commitment to teaching excellence.

29.     On the issue of student evaluations, an analysis of the data relied on by Ithaca College collected from students who took all or most of Dr. Ramlal-Nankoe's classes shows that they considered her to be an effective teacher.

30.     Contrary to the analysis contained in the majority report, the minority report relied strictly on dishonest evaluation claiming that Dr. Ramlal-Nankoe did not meet the overall criteria of teaching, scholarship and service. The minority report, specifically relied on racist, sexist and biased comments in letters that were circulated prior to the start of the tenure review process, in coming to its conclusion.

31.     In concluding that Dr. Ramlal-Nankoe did not meet the overall criterion of highly effective teaching, scholarship, and service the minority report

fails to make mention of the former students' letters supporting her teaching effectiveness or the excellent peer reviews submitted as part of her tenure application. Nor did it make any mention of the outside reviews by colleagues which uniformly endorsed her application for tenure. Nor did it take issue with the curriculum of her courses or her course materials.

32.    In focusing solely on negative comments in the minority report, eventually adopted by the defendant as the basis for denying her tenure and promotion, it violated the terms of the plaintiffs contract with the College which specifically provided that teaching effectiveness, scholarship, and service  be evaluated by a broader set of criteria.

33.    The Sociology Committee submitted their recommendation of Dr. Ramlal-Nankoe for tenure to Dean Howard Erlich. The Dean joined the minority and breached the Faculty Handbook Policies for Tenure and Promotion by requesting a separate negative letter from the Department Chairman,  member of the minority in the Sociology Committee. This letter was not shared with Dr. Ramlal-Nankoe as is required by the Ithaca College Faculty Handbook, another breach of the Handbook Policies. On November 14, 2005 the Dean sent Dr. Ramlal-Nankoe a letter of denial of tenure which he wrote he based on the "negative Chair's letter." He made this recommendation to the All College Faculty Tenure & Promotion Committee.

34.    In December 2005, Dr. Ramlal-Nankoe filed an Appeal with the Faculty Personnel Appeals Committee (FPAC) against the minority and the Dean. In her appeal Dr. Ramlal-Nankoe pointed out that the minority report of the Sociology Committee and the Dean's tenure denial letter were "misleading and grossly unfair" assessments of her teaching, scholarship, and service performance, because it resulted from their involvement in breaching Sociology Department and Faculty Handbook Policies. They had failed to consider the other parts of her tenure application, including, her self-assessment, peer evaluations, external reviewers evaluations, letters from former students, student evaluations, letters and course syllabi and materials

35.    Dr. Ramlal-Nankoe had filed complaints against sexual harassment, and racist and sexist statements against her by members of the minority, and the dean:

a. Professor Euell had circulated emails with unprofessional racist and sexist slander about her.

b. Professor Laskowitz threatened Dr. Ramlal-Nankoe that he would retaliate against her for filing complaints with Affirmative Action, the Dean, and Provost.

c. Professor Shinagawa had made sexist remarks about Dr. Ramlal-Nankoe.

-14-

d. Dean Erlich opposed Dr. Ramlal-Nankoe's teaching on controversial global issues regarding Israel-Palestine.

36.     On April, 2006 Dr. Ramlal-Nankoe received a letter from the FPAC that her appeal was granted and the minority and the Dean were found to be in violation of Faculty Handbook and Sociology Policies for Tenure and Promotion. 3 See Exhibit 7. April 19'06Decision FPAC 2005-2006.

37.     On May, 2006, after the Faculty Personnel Appeals Committee granted the appeal on behalf of Dr. Ramlal-Nankoe, Dr. Peter Bardaglio, Provost and Vice President of Academic Affairs informed the plaintiff of his decision to remedy the tenure violations with a two-year extension. Instead of granting the plaintiff tenure according to the Faculty Handbook, the Provost proposed postponing her tenure process until September 2007 because of the numerous procedural and substantive violations of the tenure process committed by Dean Howard Erlich, and the minority of the Sociology Committee.

38.     Dr. Ramlal-Nankoe rejected the proposal to postpone her tenure review. She wrote to the Provost she had met all the requirements in teaching, scholarship, and service and should be granted tenure and promotion instead of going unnecessarily for the second time through a very stressful and

_____

3 See Exhibit 7a. April 19'06Decision FPAC 2005-2006

exhausting tenure process to remedy the violations committed by the minority and the Dean at her own cost.

39.     Following Dr. Ramlal-Nankoe's rejection of his proposal Provost Bardaglio, in an attempt to force the plaintiff to accept the postponement of her tenure, arbitrarily changed the requirements for scholarship for tenure and promotion which is in conflict with the explicitly written criteria for scholarship. The Ithaca Policy Manual (also called Handbook) states that "written criteria" are the "only criteria" to be used whether scholarship standards have been met. The Provost demanded that the plaintiff should publish a book in order to be granted tenure. Dr. Ramlal-Nankoe disputed that her scholarship was insufficient for tenure and promotion.

40.     Dr. Ramlal-Nankoe's objections were ignored. In May 2006, she agreed to a two-year extension of her tenure review. Before agreeing, Dr. Ramlal-Nankoe requested the removal of all three members of the Sociology minority and the Dean from her new tenure review. However, the Provost barred only two members of the minority, Julian Euell, and Larry Shinagawa while leaving one member of the minority, Chairman Jonathan Laskowitz, and Dean Howard Erlich in her new tenure review process.

41.     In a formal agreement letter signed and cc'd to President Peggy Williams, Provost Bardaglio laid down the terms of Dr. Ramlal-Nankoe's contract and new tenure round.

a. Euell and Shinagawa were barred from participating,

b. Correction of violations,

c. Fairness in new tenure round, supervised by Provost Office,

d. Dr. Ramlal-Nankoe had to update her scholarship.  See Exhibit 9. Con-
   tract Agreement with Provost Bardaglio, 2006.


42.     Prior to her new tenure review which was scheduled for Sep-
tember 2007 Provost Bardaglio requested a meeting with the Sociology Com-
mittee, Dean Howard Erlich, and the college attorney Nancy Pringle to discuss
the terms of Dr. Ramlal-Nankoe's new tenure round. The meeting was planned
around December 2006 or January 2007.


43.     However, the intended meeting never took place. In early
January 2007 Provost Bardaglio suddenly resigned from his position and left
Ithaca College. Neither President Peggy Williams nor college attorney Nancy
Pringle who were both co-drafters of the terms of Dr. Ramlal-Nankoe's new con-
tract upheld the agreement after Provost Bardaglio's departure.


44.     During the two-year extension period, Dr. Ramlal-Nankoe con-
tinued to develop her scholarly work. Since that time, she has far exceeded the
requirement for scholarship. As in her 2005-2006 tenure review, Dr. Ramlal-
Nankoe more than meets Ithaca College's standard for teaching.

45.    In Spring 2007 the climate in Dr. Ramlal-Nankoe's department took a turn for the worse. Members of the majority who had recommended Dr. Ramlal-Nankoe for tenure in 2005 suddenly became very hostile towards her and breached the terms of her new contract. Faculty members came to observe Dr. Ramlal-Nankoe's classes without sharing their observation reports with her. In an attempt to obstruct her to fulfill her scholarship requirement she was prohibited several times from sending updates on her scholarly progress to her external reviewers.

46.    Without the contractually agreed upon guidance and supervision from the administration the violations and breach of Faculty Handbook and Sociology Department Policies for tenure were bound to be repeated in worse form in Dr. Ramlal-Nankoe's new tenure review.

47.    At the time of Dr. Ramlal-Nankoe's new tenure round in September 2007 the Sociology Committee did not provide her with the required documents which she needed to prepare her tenure file. This delayed the submission of her tenure file. Three of the four members of the majority of 2005 (one had retired) who had written very strong letters on Dr. Ramlal-Nankoe's teaching changed their position 180 degree in their 2007 evaluation of her teaching. Dr. Ramlal-Nankoe submitted her tenure file without the following required documents:

a. the department teaching statement,

b. the updated service statement,

c. the final draft of the scholarship statement.

48.     One faculty member wrote a letter for her tenure file before Dr. Ramlal-Nankoe had submitted her file for review. Nevertheless, this faculty member claims that her letter is based on review of Dr. Ramlal-Nankoe's full file. When Dr. Ramlal-Nankoe alerted her that her file had not been submitted at the time that particular faculty member stated that she would go through the file and rewrite her assessment. She never did.

49.     On July 31, 2008, the American Association of University Professors ("AAUP") wrote a letter to the new President of Ithaca College, Thomas R. Rochon, concerning Dr. Ramlal-Nankoe's "inordinately excessive" probationary period, since a decision on her tenure should have been reached by the end of the 2002-03 academic year, but was not scheduled until 2005. The AAUP recommended that Dr. Ramlal-Nankoe be granted "the protections against involuntary termination that accrue with indefinite tenure." [4] See Exhibit 11. letters from AAUP to Thomas R. Rochon.

50.     In failing to execute the agreement signed by the Office of the Provost, endorsed by the President, and College Counsel to grant the plaintiff a fair tenure process, correct the violations from the previous tenure review and to

guide the new tenure review, the defendant Ithaca College violated the agreement signed in 2006. 5 See Exhibit 9. CONTRACT AGREEMENT with PROVOST BARDAGLIO 2006.

51.     By violating Section 4 of the Faculty Handbook, as further modified and expanded upon by the personnel policies of the Department of Sociology, the defendant Ithaca College breached the terms of its contract with the plaintiff.

52.     In failing to grant tenure to the plaintiff the defendant Ithaca College also violated the Faculty Handbook Policies which provides that teachers are entitled to freedom in the classroom in discussing their subject, including controversial matters, so long as it has some relation to the subject matter being taught.

53.     Dr. Ramlal-Nankoe has been subjected to discriminatory negative comments, sexual harassment, retaliation, and discriminatory interference with her tenure review process on the basis of her sex, race, and national origin. Ithaca College has failed to provide an educational and employment environment that values and respects diversity and complies with all federal and state nondiscrimination laws and statutes. Institutional policies on nondiscrimination

---

[4] See Exhibit 11. letters from AAUP to Thomas R. Rochon.

[5] See Exhibit 9. CONTRACT AGREEMENT WITH PROVOST BARDAGLIO 2006

– 20 –

and affirmative action at Ithaca College failed to uphold the principle of zero tolerance for any form of discrimination. Appeals committee(s) established that there had been multiple violations against Dr. Ramlal-Nankoe by multiple members of the Sociology faculty and the Dean. This was recognized by the provost/vice presidents and the president of the college.

54.     By violating Section 2 of the Faculty Handbook the defendant Ithaca College breached the terms of its contract with the plaintiff.

55.     In failing to grant tenure to the plaintiff the defendant Ithaca College also violated the Faculty Handbook. The Handbook states it is the policy of the College that, in accordance with federal, state and local laws, all forms of discrimination (racial, sex, sexual orientation, age, foreign status) as well as sexual harassment are prohibited at Ithaca College.

56.     In failing to promote the plaintiff, the defendant, by and through its agents and employees, has acted willfully in that it knew or should have known, or acted in reckless disregard of, the fact that its conduct was prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., the New York State Executive Law '290 et seq., and the Tompkins County Fair Practice Statute, Tompkins County Local Law No. 6 of 1991.

57.     As a direct and proximate result of the wrongful conduct of the defendants, the plaintiff has suffered a loss of income and has been denied pro-

-21-

motional opportunities as well as salary and benefits, to find full time employ-
ment, and a full-filling professional occupation, commensurate with her abilities
and her lengthy period of work and investments at the College.

58.    As a direct and proximate result of defendants' wrongful con-
duct, the plaintiff has and continues to suffer extreme mental anguish and emo-
tional distress, pain and suffering, deprivation of her liberty, humiliation, shame,
embarrassment, indignity and disgrace.

## FIRST CLAIM
### (Sex Discrimination
### Under 42 U.S.C. §2000e et seq.)

**59.**    The plaintiff incorporates by reference the allegations set in
Paragraphs **1** through **57** as if fully set forth herein. The conduct and actions of
the defendant, by and through its agents and employees, acting under color of
state law, in subjecting the plaintiff to discrimination in the terms and conditions
of her employment, was motivated by animus based on the plaintiffs sex and
was done intentionally, maliciously and/or with a reckless disregard for the natu-
ral and probable consequences of his acts, was done without lawful justification,
and was designed to and did cause specific and serious compensatory injury,
pain and suffering in violation of the plaintiffs Constitutional rights as guaranteed
under Title VII of the Civil Rights Act of 1964, as amended by the Equal Em-
ployment Opportunity Act of 1972, 42 U.S.C. 2000e et seq.

## SECOND CLAIM

**(Retaliation**
**Under 42 U.S.C. §2000e *et seq.)***

60.    The plaintiff incorporates by reference the allegations set forth in Paragraphs **1** through **59** as if fully set forth herein.

61.    The conduct and actions of the defendant, by and through its agents and employees, acting under color of state law, in retaliating against the plaintiff for filing complaints against sexual harassment, and discrimination, and breach of contract  was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification, and was designed to and did cause specific and serious compensatory injury, pain and suffering in violation of the plaintiffs Constitutional rights as guaranteed under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e *et seq.*

**THIRD CLAIM**
**(Sex Discrimination**
**Under the New York Human Rights Law)**

62.    Plaintiff incorporates by reference the allegations set forth in Paragraphs **1** through **61** as if fully set forth herein.

63.    The conduct of the defendant, acting through its agents and employees, as described above constitutes discrimination against the plaintiff because of her sex under the New York State Executive Law '290 *et seq.*

**– 23 –**

## FOURTH CLAIM
## (Retaliation
## Under the New York Human Rights Law)

**64.**     Plaintiff incorporates by reference the allegations set forth in Paragraphs **1** through **63** as if fully set forth herein.

**65.**     The conduct of the defendant, acting through its agents and employees, in retaliating against the plaintiff for filing complaints against sexual harassment, and discrimination, and breach of contract constituted discrimination in her employment in violation of the New York State Executive Law '290 *et seq.*

## FIFTH CLAIM
## (Discrimination
## Under the Tompkins County Fair Practice Statute, Tompkins County
## Local Law No. 6 of 1991)

**66.**     The plaintiff incorporates by reference the allegations set forth in Paragraphs **1** through **65** as if fully set forth herein.

**67.**     The conduct of the defendant, acting through its agents and employees, as described above constitutes discrimination against the plaintiff because of her sex and the Tompkins County Fair Practice Statute, Tompkins County Local Law No. 6 of 1991 Administrative Code of the City of New York.

## SIXTH CLAIM
## (Breach of Contract)

68.    The plaintiff incorporates by reference the allegations set forth in Paragraphs **1** through **67** as if fully set forth herein.

69.    The conduct of the defendant, acting through its agents and employees, in denying promotion and tenure to the plaintiff, predicated as it was on the violation of the express language of plaintiff's appointment letter, the express language in the yearly renewal contracts that the plaintiff and the defendants entered into, violations of the Ithaca College Faculty Handbook, and violations of the personnel guidelines of the Department of Sociology, breached the plaintiff's written contract of employment with the defendant.

## SEVENTH CLAIM
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

70.    The plaintiff incorporates by reference the allegations set forth in Paragraphs **1** through **69** as if fully set forth herein

71.    The conduct of the defendant, acting through its agents and employees, by failing to provide protection to the plaintiff against retaliation and hostile work environment, and its failure to implement adjustments to enforce fair treatment, constituted a breach of defendant's duty to act in good faith and to deal fairly with the plaintiff in the tenure and promotion process.

## EIGHTH CLAIM
### (Age Discrimination
### Under 29 USC Sec. 621)

-25-

**72.** The plaintiff incorporates by reference the allegations set in Paragraphs **1** through **70** as if fully set forth herein.

**73.** The conduct and actions of the defendant, by and through its agents and employees, acting under color of state law, in subjecting the plaintiff to discrimination in the terms and conditions of her employment, was motivated by animus based on the plaintiffs age and was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of its acts, was done without lawful justification, and was designed to and did cause specific and serious compensatory injury, pain and suffering in violation of the plaintiffs Constitutional rights as guaranteed under 29 USC Sec. 621.

**NINTH CLAIM**
**(Race  Discrimination**
**Under 42 U.S.C. 1981)**

**74.** The plaintiff incorporates by reference the allegations set in Paragraphs **1** through **73** as if fully set forth herein.

**75.** The conduct and actions of the defendant, by and through its agents and employees, acting under color of state law, in subjecting the plaintiff to discrimination in the terms and conditions of her employment, was motivated by animus based on the plaintiffs race and was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification, and was designed to and did

**– 26 –**

cause specific and serious compensatory injury, pain and suffering in violation of the plaintiffs Constitutional rights as guaranteed under 42 USC Sec. 1981.

**WHEREFORE**, plaintiff Dr. Margo Ramlal Nankoe demands judgment and prays for the following relief against the defendants:

(a)    compensatory damages in an amount to be determined by a jury for injuries suffered by plaintiff by reason of defendant's conduct that has and continues to cause her extreme mental anguish and emotional distress, pain and suffering, deprivation of her liberty, humiliation, shame, indignity and disgrace, as well as the loss of her employment with defendants;

(b)    punitive damages to the extent allowable by   law;

(c)    attorneys fees;

(d)    the costs and disbursements of this action;

(e)    such other and further relief as appears just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on each of her claims.

Melnick, Abdullah & associates LLP
Attorney For Plaintiff(s)
380 86th Street
Brooklyn, New York 11209
(718) 688-0164


Dated: December 2, 2010
   Signature_____
Issa I. Abdullah, Esq.

ITHACA

Ithaca College
206 Muller Center
Ithaca, NY 14850-7270
(607) 274-3102

Office of the Dean
School of Humanities & Sciences

May 22, 2000

Margo Ramlal-Nankoe
405 Lake Street, A-35
Ithaca, NY 14850

Dear Margo:

I am pleased to inform you that the President and the Provost/Vice President for
Academic Affairs have approved my recommendation, in concurrence with the
recommendation of the department, that you be appointed to a tenure-eligible position
as Assistant Professor in the Department of Sociology for the academic year 2000-
2001. The appointment is effective August 16, 2000, and your salary will be $40,000.

This is a full-time appointment, and you will be expected to teach twelve credit hours
per semester or the equivalent. It is further expected that you will participate actively
and cooperatively in those activities generally considered the responsibility of a full-
time faculty member, such as advisement of students and work on college, school, and
department committees.

The Department of Sociology and I have agreed that your Ph.D. from the State
University of New York at Binghamton constitutes the terminal qualification to teach in
the department. Assuming both favorable performance reviews and the continuation of
a favorable enrollment picture in the department, school, and college, you can expect
to be evaluated for tenure during the fall term of 2005, and you would be notified of
your tenure status at Ithaca College in the spring term of 2006. This will be your sixth
year of service at Ithaca College and will provide the Tenure and Promotion Committee
with five full years of teaching and professional service upon which to base an
evaluation and recommendation. If you fail to qualify for tenure, the academic year
2006-2007 will be your terminal year at Ithaca College.

Consideration for tenure will require you to demonstrate teaching excellence,
appropriate scholarly and professional activity beyond the terminal degree, and
constructive service to the college community. In addition, a positive tenure
recommendation by the department and the dean will have to demonstrate a long-term
enrollment demand in the department.

A formal appointment form is enclosed with this letter. Please correct or complete
address information and social security number if necessary. Also, indicate whether
you wish to be paid on a nine-month or a twelve-month basis by checking the
appropriate box on the appointment form. Your salary will be paid in semi-monthly
installments beginning on September 15. After you have signed the appointment form,
please return the signed form to the dean's office by the date indicated.

Margo Ramlal-Nankoe
May 22, 2000
Page 2


A copy of the academic calendar for the 2000-2001 academic year is enclosed. Please plan to join us on Monday, August 28, 2000, for the all-College faculty breakfast beginning at 8:00 a.m. in the Egbert Union Dining Hall, the all-College faculty meeting at 9:15 a.m. in Emerson A & B, and Convocation to begin at 11:00 a.m. (robing to begin at 10:40 a.m.). In addition, please check with your department chairperson to be aware of any opening department faculty meeting for the afternoon.

I join with the members of the department in expressing our pleasure with this opportunity to offer you a tenure-eligible appointment as an Assistant Professor at Ithaca College. I thoroughly enjoyed our discussion and believe you will be a valuable addition to our faculty. If you have any questions about this appointment, please do not hesitate to bring them to my attention in your response to this letter or in a separate communication. I will strive to offer as much clarification and advice as I can.

Again, I am pleased that you will continue with us in the fall. Warm best wishes.

Sincerely,

Howard Erlich by Mard- Bubind

Howard S. Erlich, Dean
School of Humanities and Sciences

HSE:jms
enclosures

cc:     James S. Malek, Provost and Vice President for Academic Affairs
        Hector Velez, Chair, Department of Sociology
        Office of Human Resources



# ITHACA

**DATE:**       April 19, 2006

**TO:**        Peter W. Bardaglio, Provost/Vice President for Academic Affairs

**FROM:**      Faculty Personnel Appeals Committee
               Gwen Seaquist, Chair

**RE:**        Appeal of Margo Ramlal-Nankoe

## A. Background

The Faculty Personnel Appeals Committee, consisting of Professors Hugh Egan, Carole Dennis, Ron Jude, Alex Shuhan and Gwen Seaquist (chair) met on April 19, 2006. Prior to this date, the Committee had already accepted the appeal of Margo Ramlal-Nankoe and had notified her. The Committee had also met with Dean Howard Erlich, Professor James Rothenberg, Jonathan Laskowitz, and the candidate.

Subsequently, the Committee determined that there were important documents missing from the candidate's file that were essential for a determination on point 1 of the appeal. The documents were received on Friday, April 14th and the Committee met on April 19, 2006 to deliberate the two points below.

## B. Merits

### ALLEGATION ONE

(This allegation is paraphrased for the sake of clarity.)
The Department of Sociology failed to follow its own internal guidelines for Peer Visitation Policies.

> The Appeal Committee was provided with documents that set forth the Department of Sociology policies on peer visitation. It is very difficult to determine, however, what specific policies were actually in effect and/or adopted by the department and what ones were not. Nevertheless, the Committee proceeded under the assumption that the documents provided, and attached hereto, were in fact the documents under which the Department of Sociology was conducting tenure reviews during the candidate's term.

> The Committee reviewed three documents that it thought important:

>> 1. A Department of Sociology "Peer Visitation Policies" dated 9/17/03 that states:

"Each tenured faculty member in the department will visit a minimum of two classes. When possible, two consecutive classes will be visited."

2. Two e-mails from Chairman Jonathan Laskowitz to all members of the department, dated September 17, 2003, and November 8, 2004, reminding senior faculty to visit Margo Ramlal-Nankoe's classes.

If the above documents do in fact represent a departmental policy that was in place for Margo Ramlal-Nankoe's tenure review, then the Committee finds that the policy was not followed, and that Margo Ramlal-Nankoe was entitled to a class visit by each tenured faculty member in the department for a minimum of two classes.

If, on the other hand, the above documents *do not in fact* represent a departmental policy that was in place for Margo Ramlal-Nankoe's tenure review, then the Committee finds that the policy was not violated.

The Committee defers to the Provost to determine what policies were in place at the time of Margo Ramlal-Nankoe's tenure process. At this point, we have tried to gather all of the relevant information and feel we can go no further in procuring documents. In other words, if another policy or other documents exist, we do not know where to go to find them.

**ALLEGATION TWO**
(This Allegation is paraphrased for the sake of clarity.)
The second allegation is a violation of Section 4.13.1.5 of the Ithaca College Policy Manual, "Procedures for the Tenure and or Promotion Review" which require that "Before making a recommendation, the dean must give the faculty member an opportunity to express the faculty's views concerning the recommendations."

Following Handbook protocol, Dean Erlich requested a separate and independent letter from Chairman Jonathan Laskowitz after the file had arrived at the Dean's office.

After discussing this matter with Professors Margo Ramlal-Nankoe, Chairman Jonathan Laskowitz and Dean Howard Erlich, it is our conclusion that the candidate did not receive a copy of the chair's independent letter. The letter was sent directly to the Dean's office and included in her file. The Dean then reviewed the candidate's file and wrote a letter regarding her file. At no time was she given an opportunity to respond to the Laskowitz letter, a clear violation of Section 4.13.1.5 of the Ithaca College Policy Manual. This section states, "The dean provides the faculty member with written copies of all recommendations..." In this instance, the Dean assumed the candidate had already been provided a copy of the letter from her Chair, but this was not the case.

Therefore, the Committee recommends that the candidate be given three business days from receipt of this letter to respond to Laskowitz's letter; that her response is then reviewed by the Dean within 24 hours of receipt, that the dean will have the opportunity to change his letter to the provost. If the dean makes no changes, he will so notify the candidate. If the Dean does make changes he will provide the candidate with a copy of the changes and she will have 24 hours to

2

respond in writing to his new comments. The letter will next be reviewed by the All-College Tenure and Promotion Committee, and if this committee wishes to change or alter its judgment as a result, it may do so. All of the correspondence regarding the chair's and dean's letters will be made a part of the candidate's file for the Provost's review.

cc:     Margo Ramlal-Nankoe, Assistant Professor, Sociology
        Howard Erich, Dean, School of Humanities and Sciences
        Jonathan Laskowitz, Chairperson, Sociology
        Jeff Lippitt, Chair, All-College Tenure and Promotion Committee

3



# AAUP

## American Association of University Professors

*Academic Freedom for a Free Society*

September 26, 2008

Dr. Thomas R. Rochon
President
Ithaca College
300 Job Hall
Ithaca, New York 14850

Dear President Rochon:

Thank you for your letter of August 28 responding to ours of July 31 concerning the case of Dr. Margo Ramlal-Nankoe. Allow me to quote the following from your letter:

> My review of Dr. Ramlal-Nankoe's record indicated that she was initially hired at Ithaca College as an Instructor for the 1997-1998 year on a one-year temporary appointment. Likewise, in both academic years 1998-1999 and 1999-2000 she was appointed to a temporary appointment. A temporary appointment addresses the short-term needs of a department due to such things as leaves of absences, enrollment, and curricular needs. Dr. Ramlal-Nankoe's appointments were all made consistent with the requirements of the Ithaca College Faculty Handbook. During the 1999-2000 academic year the Department of Sociology conducted a national search for a tenure-eligible position as Assistant Professor in the Department of Sociology effective August 16, 2000. It was very clear in the appointment letter issued at that time that this was a new appointment at Ithaca College and not a continuation of employment under her temporary assignments.

We would construe not counting Dr. Ramlal-Nankoe's temporary appointments under the *1940 Statement of Principles on Academic Freedom and Tenure* as part of her probationary period if there were a significant difference between the nature and type of duties she performed during those years and the years of her probationary appointment. Absent a significant difference in the nature of the work performed and the work expectations between the two types of appointments, we believe that work considered as temporary should be counted as part of the probationary period.

We appreciate that Professor Ramlal-Nankoe concurred in the terms of appointment that were offered to her in 2000. Still, assuming the future work for her was not to have been significantly different from her previous work, the AAUP looks upon the result as excessive probation (compounded by the subsequent additional two years) that should not have been offered and accepted.

1012 Fourteenth Street, NW • Suite 500
Washington, DC 20005-3465
Phone: 202.737.5900· Fax: 202.737.5526
Web: www.aaup.org

We would welcome your giving this matter further consideration.

Sincerely,

Anita Levy, Ph.D.
Associate-Secretary

cc:   Dr. Peggy R. Williams, President Emerita
      Professor Margo Ramlal-Nankoe

# AAUP
## American Association of University Professors

*Academic Freedom for a Free Society*

August 27, 2008

Dr. Thomas R. Rochon
President
Ithaca College
300 Job Hall
Ithaca, New York 14850

Dear President Rochon:

We have yet to receive a response to our letter of July 31 concerning the case of Dr. Margo Ramlal-Nankoe. A copy of that letter is enclosed for your convenience.

The issues we raised in that case remain of concern to us. We hope to hear from you shortly.

Sincerely,

Anita Levy, Ph.D.
Associate Secretary

Enclosure

cc. Dr. Peggy R. Williams, President Emerita
    Professor Margo Ramlal-Nankoe

1012 Fourteenth Street, NW • Suite 500
Washington, DC 20005-3465
Phone: 202.737.5900 • Fax: 202.737.5526
Web: www.aaup.org

# AAUP

American Association of University Professors

1012 Fourteenth Street, NW
Suite 500
Washington, DC 20005-3465
Phone: 202.737.5900
Fax: 202.737.5526
Web: www.aaup.org

July 31, 2008

Dr. Thomas R. Rochon
President
Ithaca College
300 Job Hall
Ithaca, New York 14850

Dear President Rochon:

Congratulations on your recent appointment as the president of Ithaca College.
We need to write to you about a case that preceded your arrival.

Dr. Margo Ramlal-Nankoe, who has been a full-time assistant professor in the Department of Sociology at Ithaca College, has sought the advice and assistance of the American Association of University Professors as a result of a letter, dated June 19, that she received from President Peggy R. Williams, informing her that she was not recommended for tenure and that her appointment would not be renewed beyond the end of 2008-09 academic year.

The Association's interest in the case of Dr. Ramlal-Nankoe, as you are doubtless aware, stems from its longstanding commitment to academic freedom and tenure, the principles of which are set forth in the enclosed 1940 *Statement of Principles on Academic Freedom and Tenure.* That document, a joint formulation of AAUP and the Association of American Colleges and Universities, has received the endorsement of over 200 scholarly and educational organizations.

Regulation 1(b) of the Association's derivative *Recommended Institutional Regulations on Academic Freedom and Tenure* (enclosed) provides that, "With the exception of special appointments clearly limited to a brief association with the institution, . . . all full-time appointments are of two kinds: (1) probationary appointments; (2) appointments with continuous tenure." The 1940 *Statement of Principles* calls for a maximum period of probation not to exceed seven years of full-time faculty service. The authors and endorsers of the 1940 *Statement* consider continuance of full-time service beyond the maximum probationary period as entitling faculty members who so serve to the procedural protections that accrue with tenure, whether or not there has been specific action to that effect by the college or university concerned.

We noted among the information Dr. Ramlal-Nankoe has sent us many disputes involving procedural and substantive elements of her tenure review process, with perhaps the most striking among them being the inordinately excessive probationary period under which she served. Dr. Ramlal-Nankoe informs us that her full-time faculty service began in 1997, and that she has served continuously since that time. We understand that from 1997 to 2000 she held a position designated officially as non-tenure-track. Those three years of service do not seem to have been the kind of special appointment of brief duration that AAUP's Regulation 1(b)

allows as an exception to full-time faculty appointments that need be either with indefinite tenure or probationary for tenure.

In 2000 Dr. Ramlal-Nankoe changed to a tenure-track position, and in 2005 she underwent her first review for tenure. At that time, following her appeal of procedural violations in the tenure review process, she was granted a two-year extension of her probationary period, and in 2007-08 she was reviewed for tenure again. While we appreciate that Dr. Ramlal-Nankoe consented to the extension of her probationary period with termination the alternative, under the 1940 *Statement of Principles* a decision on whether to retain Dr. Ramlal-Nankoe with tenure should have been reached by the end of the 2002-03 academic year, with 2003-04 her terminal year in the event of a negative decision. We note that the college's own policies, in Section 4.12.2 of the Policy Manual, state that "[t]he tenure review normally occurs in the sixth year," which in her case would have been 2002-03. Instead, she had concluded her eleventh year when President Williams notified her that a final decision had been reached, and will have completed her twelfth year of full-time service by the end of her 2008-09 terminal year, far beyond the permissible period of probation.

We recognize that the information on which this letter is based has been provided to us exclusively by Dr. Ramlal-Nankoe. We would therefore welcome your comments. If, however, the facts recounted above are essentially accurate, we would ask that you consider recognizing that the length of her full-time faculty service warrants affording her the protections against involuntary termination that accrue with indefinite tenure.

Sincerely,

Anita Levy, Ph.D.
Association Secretary

cc:   Dr. Peggy R. Williams, President Emerita
      Professor Margo Ramlal-Nankoe

# ITHACA

OFFICE OF THE PRESIDENT

August 28, 2008

Anita Levy, Ph.D
Association Secretary
1012 Fourteenth Street, NW
Suite 500
Washington, D.C.   20005-3465

Dear Dr. Levy:

I am in receipt of your letter dated July 31, 2008 inquiring as to the status of Dr. Ramlal-Nankoe. As the president of Ithaca College and also as someone with a long history in the academy, I can assure you that I have a long and demonstrated commitment to academic freedom and tenure.

In reviewing issues related to both tenure and academic freedom, the Ithaca College Faculty Handbook is our governing document. The Ithaca College Faculty Handbook was developed by the Ithaca College faculty and approved by the administration and the Ithaca College Board of Trustees. It is the governing document for all faculty personnel matters.

In your letter you make reference to an "excessive probationary period" under which Dr. Ramlal-Nankoe served. My review of Dr. Ramlal-Nankoe's record indicates that she was initially hired at Ithaca College as an Instructor for the 1997-1998 year on a one-year temporary appointment. Likewise, in both academic years 1998-1999 and 1999-2000 she was appointed to a temporary appointment. A temporary appointment addresses the short-term needs of a department due to such things as leaves of absences, enrollment, and curricular needs. Dr. Ramlal- Nankoe's appointments were all made consistent with the requirements of the Ithaca College Faculty Handbook.

During the 1999-2000 academic year the Department of Sociology conducted a national search for a tenure-eligible position. Dr. Ramlal-Nankoe was the successful applicant in this search and was appointed to a tenure-eligible position as Assistant Professor in the Department of Sociology effective August 16, 2000. It was very clear in the appointment letter issued at that time that this was a new appointment at Ithaca College and not a continuation of her employment under her temporary assignments. The appointment letter clearly stated that the appointment was effective August 16, 2000, that she would be provided a complete six year probationary period, and that she would be notified of

Anita Levy, Ph.D
August 28, 2008
Page Two

her tenure status at Ithaca College in the spring term of 2006. The appointment letter
accurately reflected the terms of a probationary appointment at Ithaca College consistent
with the terms of the Ithaca College Faculty Handbook.

As you point out in your letter, Dr. Ramal-Nankoe was granted a two year extension of
her probationary period. The reasons for this extension were two-fold: 1) to provide an
opportunity to address perceived procedural violations raised by Dr. Ramlal-Nankoe
including but not limited to lack of required peer reviews of her teaching, and 2) to allow
her additional time to address scholarship concerns that had been raised during her tenure
review. Again, this extension was granted in accordance with the Ithaca College Faculty
Handbook.

In closing, I fully understand that your position is that AAUP policies need to be
followed. However, Ithaca College is bound by the terms and conditions as found in the
Ithaca College Faculty Handbook. In any instances in which the faculty-approved
Faculty Handbook is not in agreement with AAUP guidelines, our correct course of
actions is to follow the Faculty Handbook. Ithaca College does not define a probationary
period leading to tenure in the same manner as the AAUP defines a probationary period
leading to tenure. Therefore, I do not concur with the AAUP's opinion that Dr. Ramlal-
Nankoe's temporary appointments must be added to the probationary period for her
tenured eligible appointment. In accordance with the Ithaca College Faculty Handbook,
since Dr. Ramlal-Nankoe was not granted tenure the 2008-2009 academic year is the
terminal year of Dr. Ramlal-Nankoe's appointment at Ithaca College

Sincerely,

Thomas R. Rochon
President

cc: Dr. Peggy R. Williams, President Emerita
    Professor Margo Ramlal-Nankoe

4

# ITHACA

OFFICE OF THE PROVOST AND VICE PRESIDENT
FOR ACADEMIC AFFAIRS

May 26, 2006

Professor Margo Ramlal-Nankoe
School of Humanities and Sciences

Dear Margo:

I have reviewed your recent e-mail dated May 20, 2006, and I am now enclosing a contract that extends your probationary period for two additional years. This extension will provide an opportunity to address your concerns and the procedural errors that occurred during your 2005-2006 tenure review. It will also provide you additional time to complete the scholarship you indicated was in process when you submitted your 2005-2006 tenure file. This extension will mean that you will be reviewed for tenure in fall 2007 with a final determination by the board of trustees during spring semester 2008.

Your tenure review in 2007-2008 will include your teaching, service and scholarship record for the period 2000-2001 through the submission of your updated file in fall 2007. I will require that Professor Euell and Professor Shinagawa excuse themselves from your 2007-2008 tenure review. In addition, I will require each of the remaining tenured members of your department to each visit your classroom at least two times as stipulated in the department procedures. In accordance with Faculty Handbook section 4.13.1.5(c), the department chair will submit a chair recommendation as part of your 2007-2008 review. You will be permitted a response to all recommendations in accordance with Faculty Handbook section 4.13.1.5(d).

Please return the enclosed contract by June 15, 2006. If I have not received the signed contract by June 15, I will assume you are declining the terms as outlined and I will proceed with my tenure recommendation to President Williams, which will allow time for the board of trustees to render a tenure decision on your 2005-2006 record prior to the start of the 2006-2007 academic year.

Sincerely yours,

Peter W. Bardaglio
Provost and Vice President for Academic Affairs


cc: President Peggy Williams
    Dean Howard Erlich

Ithaca College / 350 Job Hall / Ithaca, New York 14850-7012
607-274-3113 / Fax: 607-274-3064 / www.ithaca.edu

Dr. Peter W. Bardaglio
Provost and Vice President for Academic Affairs
Ithaca College
350 Job Hall
Ithaca, New York 14850-7012

Dear Dr. Bardaglio:

Thank you for your letter of May 26, 2006. After carefully considering your offer of an additional two year appointment for consideration of my tenure, I accept your offer, and have enclosed a copy of the signed contract.

I would like to note some reservations I continue to have about the manner in which the College conducted the review of my tenure, however, so that these issues might be resolved by the time of the new tenure review, starting in the Fall of 2007.

First, I appreciate the fact that you have required that Professor Euell and Professor Shinagawa excuse themselves from the review in 2007-2008. However, I believe it is also necessary for Dean Howard Erlich and Dr. Jonathan Laskowitz, the Chair of the Sociology Department, to excuse themselves as well. As you know, both Dean Erlich and Chair Laskowitz failed to follow appropriate procedures, and engaged in serious violations of the review procedures, which have necessitated the extension of the tenure period by two years. I respectfully request that you require them to recuse themselves from the review in two years, if they are holding their current positions.

Second, I request that you ensure that the Department Chair not submit a separate recommendation as the Chair of the Department. The Sociology Department has long followed the practice that department chair does not write a separate letter of recommendation. But rather writes a letter summarizing the discussion of the personal committee. See Attachment A. As you stated in a memo dated April 11, 2005, faculty members such as myself, may choose either these procedures or the new procedures.

Since I chose the old procedures, Dr. Laskowitz should not submit a separate letter of recommendation.

Third, I reserve the right to claim that the only issue that should be considered in the review of my tenure in 2007-2008, is whether my scholarship meets the tenure criteria. As you know, it was settled that I met the criteria for tenure in the areas of teaching and service. Therefore, I do not believe that there should be additional review of those areas in two years. I understand that you have rejected that request. However, I reserve the right to argue in two years that since I have previously met the criteria for teaching and service, that the tenure review need not consider those two areas.

I look forward to a fair tenure process in the future, and an avoidance of the problems

with procedures and bias that I encountered in the past.  I believe that you are hopeful of the same.  Therefore, I will work with you in whatever ways possible to avoid the problems of the past, and ensure a fair process for my tenure review in 2007-2008.

Sincerely,

Dr. Margo Ramlal-Nankoe